UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
v.    )    No. 3:05-CR-127
    )    (VARLAN/SHIRLEY)
ANDRE MCGRAW,    )
    )
    Defendant.    )
    )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the district court as may be appropriate. This matter is before the Court upon Defendant Andre McGraw's *Pro Se* Motion To Suppress [Doc. 30], filed on April 10, 2006, Defendant's (Supplemental) Motion to Suppress Evidence [Doc. 57], filed on May 16, 2006, Revised Memorandum In Support Of Motion To Suppress Evidence [Doc. 64-2], filed on June 2, 2006, and Post-Hearing Brief [Doc. 87], filed on July 6, 2006. The parties came before the Court for a suppression hearing on June 23, 2006. Assistant United States Attorney Tracee Plowell was present representing the government. Attorney James A.H. Bell was present representing Defendant Andre McGraw, who was also present. At the conclusion of the hearing, the Court granted Defendant's request to have the option of filing a post-hearing brief on or before July 7, 2006 and gave the government until July 14, 2006 to file a response. The Court took the motions and related filings under advisement on July 14, 2006.

# I. <u>POSITION OF THE PARTIES</u>

The defendant's motions to suppress [Docs. 30 and 57] and post-hearing brief [Doc. 87] request the Court to suppress "all evidence obtained as a result of the warrantless search and seizure that occurred at apartment number 285G of Morningside Apartments in Knoxville, Tennessee." Specifically, he argues that the .38 caliber revolver recovered during the search of this apartment should be suppressed on the grounds that the consent to search given by Defendant's sister, Ms. Lavern McGraw-Smith, was involuntary.

The defendant states that on August 17, 2005, at approximately 4:23 p.m., Officers Dururvurur and Wilson of the Knoxville Police Department ("KPD") responded to a shooting in progress call at 1900 Linden Avenue [Doc. 58].[1] Defendant states that Officers Dururvurur and Neal, Investigator Bell, and Detective Huckelby went to Morningside Apartments and found Lavern McGraw-Smith at home [Doc. 58]. Defendant states that he shared the apartment with his sister, Ms. McGraw-Smith. He states that he shared the key to the apartment with her, helped pay the rent and other expenses, and all of his personal effects were in the apartment.

Defendant states that, on the day in question, he entered the apartment while his sister was sleeping. He did not wake her, but instead went directly to the bathroom. From the bathroom, he heard a knock at the front door. Ms. McGraw-Smith woke up and asked who it was. Detective Bell stated that it was the Knoxville Police Department and asked her if her brother was at the

---

[1] The police report [Doc. 58] indicates that upon arrival at 1900 Linden Avenue, Officer Dururvur and Investigator Chris Bell, located the victim, Tony Wallace, who had been shot in the left index finger. Complainant Wallace gave a description of the suspect as a black male, bald, wearing a blue basketball jersey with white trim and matching ball cap. Investigator Bell obtained information from an eye witness, Melvin Allen, who stated that he observed the incident take place and that he knew where the suspect's sister lived. Mr. Allen identified the sister as "Lavern" and stated that she lived in Morningside Apartments, apartment number 285G. Mr. Allen told the officers that he was familiar with the suspect, but did not know his name.

apartment. She said "no" and the detectives asked if they could search the apartment for Defendant. She consented. Defendant states that the detectives never told his sister why they were looking for Defendant, nor did they tell her that she could refuse consent.

Defendant states that "upon or before entry into the apartment," the officers brandished their firearms and entered the bedroom of the apartment with their firearms drawn and pointed in front of them. Defendant states that he placed both arms outside the bathroom door in order to surrender. He states that the officers began yelling at him and that he was then handcuffed and led out of the bedroom. Once in custody, he states that Detective Huckelby yelled at Ms. McGraw-Smith and threatened to arrest her for telling the Officers that Defendant was not in the apartment. McGraw-Smith was then asked for consent to search for the weapon and she consented. During this search, the officers recovered a .38 caliber revolver with one round expended, hidden in the closet located in the bathroom where Defendant was arrested.

The government responds [Docs. 55, 63 and 89] that consent was validly obtained from Ms. McGraw-Smith to first search the residence for Defendant and then, after locating Defendant, to search the residence for weapons.[2] The government avers that the officers neither stated nor implied that McGraw-Smith had to permit them to search the residence. Instead, in response to the officers inquiry of whether they might look for Defendant, McGraw-Smith informed them that Defendant was not present, but nonetheless invited them to enter and search. The

---

[2] Initially, it should be noted that the government argued that Defendant lacked standing to contest the search of the apartment because he was "no more than a casual visitor" [Doc. 63-1, p. 2]. It asserted that Defendant's name was not on the lease and there were no men's clothing or toiletries in the residence. Later, however, at the suppression hearing, the government stated that "based on the officer's testimony and even the defendant's...it does appear that [Defendant] does have standing to object to the search of his sister's apartment and that he was staying there for the two months" [Tr. (June 23, 2006) at p. 88]. In other words, the government withdrew its argument with regard to standing.

government states that the officers did not have their guns drawn and did not brandish their firearms at McGraw-Smith in any way, or otherwise induce her consent to the search of her residence.

The government also asserts that contrary to Defendant's claim that Detective Huckleby yelled and threatened McGraw-Smith, Detective Huckleby was not present on that date. The government states that after the officers located Defendant inside the residence, officers inquired of McGraw-Smith whether she knew Defendant was in the home and whether she had lied to the officers initially. Officers further advised her that knowingly harboring a fugitive and providing false statements to law enforcement were arrestable offenses, but it asserts that at no time did the officers threaten to arrest McGraw-Smith to induce her consent. The government states that after Defendant was removed from the residence, the officers returned to McGraw-Smith and asked if there were any weapons in the residence. McGraw-Smith informed the officers that she did not keep any weapons and told them that they were free to look around to see if there were firearms inside the home. She further stated that if firearms were inside the home that they did not belong to her. The government asserts that the officers did not have their weapons displayed in any fashion, nor did they coerce or otherwise compel McGraw-Smith to permit their search of the residence.

## II. SUPPRESSION HEARING TESTIMONY

a. Testimony of Officer Shawn Neal

The first witness called by the government was Shawn Neal ("Neal"). Neal has been a police officer with the Knoxville Police Department ("KPD") for the past five years. For approximately the past three months, he has been assigned to the Personnel Recruiting Section of

the KPD. Prior to that, he was a patrol officer. In August, 2005, Neal stated that he was assigned to work in the east sector patrol, comprising "everything east of 275," and was working as a Field Training Officer at that time. He estimated that he had made or assisted in "thousands" of arrests during his career and that 15-20 percent of those arrests were firearms related.

On August 17, 2005, he stated that he was working with Officer Hakan Dururvurur ("Dururvurur"), who was in his final stage of field training at that time. Neal stated that he was in civilian clothes and was observing Dururvurur's activities. Neal stated that he and Dururvurur were in a marked police vehicle when they were directed to respond to a shooting in Linden Park. He stated that they spoke to one witness on the scene, who gave them a description of the suspect and told them that the suspect lived in the Morningside [apartment] building. Neal further stated that Investigator Bell ("Bell") was on the scene and that Bell talked to the "Super" of Morningside Apartments and "narrowed it down to an apartment." Neal stated that through their investigation, they learned that the apartment was occupied by Lavern Smith ("McGraw-Smith"). Neal, Dururvurur and Bell then went to the Morningside apartment and knocked on the door.

Neal stated that when McGraw-Smith asked who it was, they said it was the Knoxville Police Department and asked if they could come in. He said they explained to her "the basics of what [they] were doing" and she allowed them to enter the apartment. Neal stated that they asked her if there was anyone else in the apartment with her and she said no one else was there. Neal stated that they then asked McGraw-Smith if they could look around to see if anyone else was in the apartment and she consented. He stated that no one had their firearm out, that she was not threatened, and that she was not restrained or "touched" by the police in any way. Neal described McGraw-Smith as appearing "surprised the police had come to her house," but stated that he did not

have any trouble understanding her and indicated that she was "cooperative."

Neal stated that once they received consent to look around the apartment, he remained with McGraw-Smith, who sat down on the couch while Dururvurur and Bell began looking around the apartment. He stated that when Dururvurur and Bell discovered the defendant "hiding in the bathroom," they drew their weapons and pointed them at the bathroom door. Neal stated that the defendant put his hands outside [the door] and that the officers reholstered their weapons and took the defendant into custody. Neal stated that after they found the defendant, Bell asked McGraw-Smith if there were any firearms in the house. She said no. Bell then asked her if he could look around and she said, "go ahead." Neal indicated that besides himself, Bell and Dururvurur were the only officers present in the residence when McGraw-Smith was asked for consent. He also indicated that no one's firearm was drawn at that time and stated that "the only instance where an officer's firearm was drawn was when the defendant was in the bathroom." Neal stated that McGraw-Smith was not threatened or physically restrained and that nothing was done to induce her consent. Neal indicated that Bell found a pistol on the top shelf of the bathroom closet where the defendant had been located.

On cross examination, Neal agreed that all KPD squad cars are equipped with video cameras and recording equipment. He also agreed that the KPD had a written policy that the [video] recorder is supposed to be operational and the microphone is to be on any time an officer comes in contact with a suspect. Neal testified that while the audio/video was "not switched off," there was no audio recording of the incident in question. When asked to explain this, Neal stated that "certain things limit the range of that mike, including structures, radio signals, things of that nature." He also indicated that the patrol car was parked "about 65-70 feet" from the apartment building and that the

apartment where the defendant lived was located on the "second or third floor." On redirect, Neal indicated that he had reviewed the audio/video tape from that day and that nothing had been captured. Neal agreed that dispatch radioed that there had been a shooting in Linden Park and stated that the suspect was described as a "bald, black male wearing a blue or black jersey with white trim and a blue or black hat." Neal testified that prior to going to Defendant's apartment, the officers did not know the defendant's name. He stated that the witness they spoke to only knew "about where the defendant stayed," but did not know the defendant's name. He indicated that they only had the defendant's sister's name at that time.

Neal stated that he had not had any previous personal contact with McGraw-Smith and agreed that he did not know anything about her emotionally or physically. Neal likewise agreed that he did not know whether McGraw-Smith had sustained any type of brain injury. He indicated, however, that he did not detect any speech disruptions or have trouble communicating with her.

Neal indicated that after they knocked on McGraw-Smith's apartment door and announced that it was the KPD, there was a 2-3 minute pause. He stated that McGraw-Smith asked the officers to "wait for a minute" after she asked who it was. He further indicated that she was "cooperative" and answered the door. Neal testified that McGraw-Smith had a "house dress" on and that it was possible that she had been laying down.

Neal testified that Investigator Huckleby was not at the apartment on that date. He further stated that he "couldn't intelligently say what Investigator Huckleby was doing that day." Neal described Investigator Huckleby as being a dark skinned, black male, who was 5' 5" to 5' 6" tall, medium build, and had gold teeth in the front. Neal also indicated that Huckleby was a plain clothes law enforcement officer. On redirect, Neal once again stated that Huckleby was not at the

apartment; he stated that "besides Investigator Bell, I was the only other individual in a shirt and tie."

Neal described McGraw-Smith's apartment as an "economy apartment" with a "little living area and a small kitchenette" with a bathroom located "right off" the only bedroom. He agreed that there was a couch located in the living room and that when he was invited into the apartment, it was obvious that McGraw-Smith had been sleeping there, as evidenced by a pillow, covers and other things. Neal described the apartment as having "no real hallway" leading from one area to another; the rooms are just "adjacent to each other." He stated that you would "exit" the living room by going through a door into the bedroom and that the bathroom was adjacent to the bedroom. Neal testified that when McGraw-Smith gave them permission to look around the apartment, he stayed with McGraw-Smith in the living room area while Dururvurur and Bell entered the bedroom. Neal testified that he could still see Dururvurur and Bell when they entered the bedroom. He indicated that

he "position[ed]" himself to where he could keep McGraw-Smith in his peripheral while he "look[ed] over to the bathroom." Neal testified that after Dururvurur and Bell entered the bedroom, Bell tried to open the [bathroom] door and there was some resistence.

Neal agreed that McGraw-Smith was not told that she had the right to refuse consent to search. He indicated that "she was just asked for consent." Specifically, he stated that "[w]e asked if there was anyone else in the apartment with her. She stated that there was not. We asked if we could look around to make sure there was nobody else in the apartment. She said, 'yes.'" Neal testified that Bell told McGraw-Smith why they were there; that they were investigating something that happened outside and that they were looking for someone that may have lived with her. He said

8

they asked her if she had anyone living with her and she said, her "brother." Neal agreed that later on they found clothes and other evidence that Defendant was living there, including a basketball jersey that was on the floor of the bathroom.

Neal agreed that once Defendant was found in the bathroom, he came out unarmed with his hands out, was cooperative, and did not try to resist. Neal testified that Defendant was handcuffed and frisked. Neal agreed that no contraband, guns or money were found on Defendant's person. Neal indicated that once Defendant was taken into custody, he was "eventually taken outside and put in the police car...after a time of being upstairs." Neal testified that he was the one who talked to McGraw-Smith after Defendant was located in the home. He testified that he said, "[w]hy didn't you tell us he was in the bathroom? I could put you in jail for that." Neal stated that he was "firm," but "wasn't yelling." He stated that he told McGraw-Smith that "she <u>could</u> go to jail," but "didn't tell her she <u>was</u> going to jail." On redirect, Neal testified that McGraw-Smith responded, "I didn't know. I was asleep. I didn't know he was in the apartment." Neal indicated that he "let it go at that; "I said what I had to say and that was it." Neal stated that it was a "couple of minutes after" this that Bell asked McGraw-Smith for consent to search the apartment again.

On cross, Neal indicated that it was Bell who asked McGraw-Smith's for her permission to search the apartment again. He said that Bell asked her whether there were any weapons in the house; she said no; then Bell asked if they could look around. Neal agreed that they did not tell her she had a right to refuse. He also agreed that they did not advise McGraw-Smith that she had a right to require law enforcement to get a search warrant to search her home. He further agreed that McGraw-Smith did not sign a written consent form and that she was not offered one. Neal testified, however, that "verbal consent is the standard." He stated that if "the person refuses

my request for consent, then that is where I stop."

b.  Testimony of Defendant Andre McGraw

The defendant testified on his own behalf after the Court questioned him about his voluntary decision to testify and reminded him of his right to remain silent and not to incriminate himself in any way.  The defendant stated that he understood his rights and that he wanted to testify.

Defendant testified that his last residential address was "Apartment 185-G Linden Avenue, Morningside Apartments," located on the second floor of the apartment building.  He stated that he shared this apartment with his sister.  He indicated that he occupied the bedroom in the apartment and that all of his clothes and personal effects were in there, but stated that the bathroom was jointly shared.

Defendant testified that on August 17, 2005, he was in the bathroom of the apartment when he heard Bell and Huckleby knock on the front door.  Defendant did not specifically remember Officer Neal.  He did, however, state that Detective Huckleby was present at his sister's apartment that evening.  He stated, "There is no doubt. There is no question whatsoever in my mind.  He was present."  Defendant described Huckleby as a black, American male,  between 5' 9" to 6' 0" tall, with facial hair, weighing anywhere from 195-200 pounds, and stated that he was dressed in plain clothes. He stated that he did not notice Huckleby's teeth.  Defendant testified that he remembered Bell, Huckleby, and Dururvurur being at the apartment, but could not remember Officer Neal.

Defendant stated that his sister was asleep on the couch when he entered the

apartment.  He testified that he did not wake her and that she didn't know he was in the bathroom.

Defendant stated he was inside the bathroom when he heard the initial knock at the door and heard

Bell identify himself and the KPD.  Defendant stated that his sister opened the door.  Defendant

testified that he heard Bell ask McGraw-Smith if her brother was home; she told him, "no." He

stated that Bell then asked her, "would you mind if we come into the apartment to search for your

brother's person"; she gave consent.  Defendant stated that Bell's tone of voice "was one of alarm."

Defendant reluctantly admitted, however, that he did not know whether the officers' weapons were

drawn when they entered the apartment because he could not see them.

Defendant testified that he heard the officers moving around in the bedroom of the

apartment, so he opened the bathroom door wide enough to stick his hands through the door.  He

stated that Huckleby then began "hollering and screaming, 'hands, hands, let me see hands.'" He

stated that he then brought his person all the way out of the bathroom and was in full view of

Huckleby and Dururvurur.  He indicated that Huckleby had his weapon drawn and aimed at

Defendant.  Defendant testified that Bell was standing in the living room with his sister and the other

arresting officer at that time.  He stated that he was handcuffed in the bedroom and then Huckleby

and Dururvurur escorted him into the living room of the apartment where stood Bell, his sister and

another uniformed officer.

Defendant testified that Huckleby then began "hollering and screaming and

threatening" his sister, stating "I ought to lock you up for lying to the police officer."  Defendant

stated that he told Huckleby that his sister did not know he was there; that she had been asleep on

the couch.  Defendant testified that Bell "holler[ed]...get him out of the apartment."  Defendant

stated he was then escorted out of the living room, but that he did not go any further than the

threshold of the door of the apartment. Defendant stated that "he could still hear and see what was going on."

Defendant testified that the officers did not ask him for permission to search the apartment; he stated they asked his sister. Defendant testified that "the first consent [when officers asked to search for Defendant] was given voluntarily. The second consent [given after Defendant was located in the apartment] was given through "coercion and fear and intimidation." Defendant stated that immediately following Huckleby's threats, Bell told his sister that she was "not in any trouble" and to "calm down." He stated that Bell then asked her for permission to search the apartment for a weapon. Defendant stated that his sister "was in fear"; that "she had been intimidated"; and that "she was too afraid to tell Bell no." He stated that he knew this because he "witnessed it" and "he knows [his] sister," stating "I have been around her all my life."

Defendant testified that his sister, McGraw-Smith, is disabled. He stated that she suffered from a head injury, which she received when she was attacked, assaulted and bludgeoned in the head "by some thug" in Alabama.[3] Defendant testified that he knew his sister's mental condition had not improved because "her mind comes and goes." Defendant stated that, at times, his sister is "very capable" of taking care of herself. But then other times, she "blanks out" and is "not able to do for herself"; "she is not able to communicate and to socialize with other people and she is not able to make competent decisions for herself." He stated that one of the reasons he stayed with his sister was to act as a "caretaker" for her. Defendant stated that in August, 2005, McGraw-

---

[3] At this point, defense counsel attempted to submit Ms. McGraw-Smith's medical records from Alabama and UT Medical Center. The government objected on the basis that the records were from 1997, not 2005, and therefore were not relevant to McGraw-Smith's present mental condition at the time of the incident in 2005. Defense counsel, in turn, argued that McGraw-Smith's condition is not one that heals over time. The Court did not allow the medical records to be entered into evidence at this time for lack of foundation.

Smith's medical condition had "improved only slightly" since 1997-1998. Defendant indicated that his sister was now living with relatives in Athens, Tennessee because she needed someone to take care of her. He also indicated that she had not been employed since 1997. Defendant stated that McGraw-Smith was on 4-5 different medications that she took on a nightly basis. McGraw -Smith's medical records were entered into evidence at this time [Def. Ex. 1 and 2].

On cross examination, Defendant agreed that he was inside the bathroom of the apartment when the officers arrived and that he could not see the door from the bathroom. He stated that he had never seen Investigator Bell before that date, but insisted that he knew Bell was the officer at the door. Defendant agreed that it was just his own speculation that the officers had their guns drawn when they entered the apartment.

Defendant stated that his name was not on the lease of the apartment. He indicated that he had lived with his sister for approximately two months prior to August 17, 2005, and that he stayed there "Every day and night, when I decided to come home, I slept there and ate there."

Defendant agreed that when he heard the knock on the door, he did not come out of the bathroom to see who it was, nor did he come out of the bathroom when the officers were talking to his sister. Defendant stated that no one attempted to open the bathroom door; that he, instead, stuck his hands outside the bathroom door to let the officer know he was in there.

Defendant stated that Detective Huckleby introduced himself to Defendant when the officers took Defendant to the KPD. Defendant stated that he remembered Officer Neal's name in the arrest report, but did not remember his face. He further indicated that he remembered Bell's face "clearly," Huckleby's face "very clearly," and remembered Officer Dururvurur because he was one of the arresting officers. Defendant agreed that Neal could have been there, but he could not

specifically remember his face.

Defendant testified that he was incarcerated at the time his sister was injured. He stated that his family told him about it and that he understood it occurred in 1997 or 1998. Defendant admitted that the only time he had ever lived with his sister was for the two-month period preceding his arrest on August 17, 2005.

c.  Testimony of Detective Joseph Huckleby

The government called Detective Huckleby as a rebuttal witness. Huckleby indicated that he has worked with the Knoxville Police Department Criminal Investigation Division for the past twelve years. He stated that for the past eight years, he has worked in the Major Crimes Department. Huckleby testified that he did not participate in the investigation or arrest of Defendant Andre McGraw. He further stated that he was not in the Morningside Garden Apartments on Linden Avenue on August 17, 2005.

**III.  FINDINGS OF FACT**

On August 17, 2005, Officers Neal and Dururvurur were working together when they received a call from dispatch regarding a shooting in Linden Park. Investigator Bell also responded to the call and was on the scene. Through their investigation, the officers learned that the suspect [Defendant] was staying with his sister, Lavern Smith ("McGraw-Smith"), at Morningside Gardens Apartments (an apartment complex located next to Linden Park), apartment number 285G, in Knoxville, Tennessee. Detective Joseph Huckleby did not participate in the investigation of Defendant; he was not in apartment 285G on August 17, 2005; and he did not participate in

Defendant's arrest.

Officers Neal and Dururvurur and Investigator Bell went to apartment 285G and knocked on the door at approximately 4:15 p.m. Ms. McGraw-Smith was asleep on the couch in the living room when the officers knocked. She was awakened by the knock and asked who was at the door. The officers announced, "Knoxville Police Department," and asked her if they could come in. McGraw-Smith opened the door and allowed them to enter the apartment. The officers did not have their weapons drawn when they entered the apartment. Investigator Bell informed McGraw-Smith that they were investigating something that happened outside and that they were looking for someone that may have lived with her. McGraw-Smith told the officers that her brother [Defendant] lived with her, but stated that no one was in the apartment with her at that time. Bell asked her if they could look around the apartment to make sure nobody else was in the apartment. McGraw-Smith said, "yes." The officers did not threaten or restrain Ms. McGraw-Smith, nor were their firearms drawn when they asked for consent to search.

Apartment 285G is a small, one-bedroom/bathroom apartment. Ms. Lavern McGraw-Smith's name is on the apartment lease. Defendant's name is not on the apartment lease, but Defendant had lived at this apartment with his sister from approximately June, 2005 thru August, 17, 2005. Defendant's kept clothes and personal effects at this residence.

Officer Dururvurur and Investigator Bell entered the bedroom to search for Defendant, while Officer Neal stayed with McGraw-Smith in the living room area. Before the officers had arrived that day, Defendant had entered the apartment while his sister was asleep on the couch. Defendant was in the bathroom when he heard the officers knock on the door. Defendant heard, but did not see, the conversation between the officers and his sister. Defendant heard, but did

not see, his sister consent to the search. Bell and Dururvurur conducted a search of the apartment and discovered Defendant in the bathroom and drew their weapons at him. Defendant did not resist arrest and once he was placed in handcuffs, Bell and Dururvurur reholstered their weapons. Defendant was then escorted into the living room of the apartment where Officer Neal and Ms. McGraw-Smith were located.

Officer Neal asked McGraw-Smith why she had not informed them that Defendant was in the bathroom. He told her that he could put her in jail for that. Neal's tone of voice was firm, but he did not yell at McGraw-Smith. McGraw-Smith responded that she had been asleep and did not know Defendant was in the apartment. Defendant was then escorted out of the living room and stopped at the threshold of the apartment door. Investigator Bell asked McGraw-Smith if there were any weapons in the apartment. She said, "no." Bell asked if they could look around. She said, "go ahead." Defendant both heard and saw McGraw-Smith give the officers consent to search her apartment for weapons. The officers did not ask Defendant for permission to search the premises. Defendant never protested the search or otherwise objected to the search of the apartment. Officers Neal and Dururvurur and Investigator Bell were the only officers in the apartment at this time. A search was conducted and Bell discovered a pistol on the top shelf of the bathroom closet where Defendant was found.

The officers did not inform McGraw-Smith that she had a right to refuse the search; the officers did not advise her that she had the right to require law enforcement to obtain a search warrant to search her home. Ms McGraw-Smith did not sign a written consent form, nor was she offered one. When McGraw-Smith verbally consented to the search for weapons, the officers did not have their weapons drawn, nor was she physically restrained.

Ms. McGraw-Smith was born on March 12, 1959; she was 46 years-old on August 17, 2005. In May, 1997, McGraw-Smith suffered a traumatic head injury and underwent surgery for same. Defendant was incarcerated when McGraw-Smith was injured in 1997; he learned of her injury/condition from family members. The only time Defendant has ever lived with Ms. McGraw-Smith was from June, 2005 thru August 17, 2005. Defendant has described McGraw-Smith as being "very capable" of taking care of herself to "blank[ing] out," at times, and not being able to communicate with others or take care of herself. Officer Neal described Ms. McGraw-Smith, on August 17, 2005, as appearing "surprised the police had come to her house," but "cooperative." Officer Neal could not detect any speech disruptions, nor did he have trouble communicating with her.

Officer Neal's squad car was equipped with audio and video recording equipment. It was "not switched off" on August 17, 2005, but nonetheless nothing was captured on the audio/video tape from that day. Neal's patrol car was parked approximately 65-70 feet from the Morningside Gardens apartment building; apartment 285G is located on the second floor. Neal explained that certain things, including structures and radio signals, limit the range of the microphone.

## IV. ANALYSIS

Defendant McGraw contends that all evidence seized on August 17, 2005, pursuant to a warrantless search of the apartment he shared with his sister, should be suppressed because his sister's consent was not given voluntarily. The government contends, to the contrary, that consent was validly obtained from Ms. McGraw-Smith, first to search the residence for Defendant and then, after locating Defendant in the apartment, to search the residence for weapons.

<u>a. Standing to Challenge the Search</u>

In order to have standing to contest whether a search comports with the Fourth Amendment, the defendant must have "a legitimate expectation of privacy" in the location searched. <u>Rakas v. Illinois</u>, 439 U.S. 128, 143 (1978). "It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." <u>United States v. Talley</u>, 275 F.3d 560, 563 (6th Cir. 2001). A finding of a reasonable expectation of privacy does not turn solely upon the defendant's subjective belief but also depends upon (1) the defendant's interest in and control of the place searched; (2) any measures the defendant took to ensure privacy; and (3) whether society recognizes the defendant's expectation as reasonable. <u>United States v. Padin</u>, 787 F.2d 1071, 1075-76 (6th Cir.), <u>cert. denied</u>, 479 U.S. 823 (1986).

Initially, the Court notes that the government has withdrawn its argument that Defendant lacked standing and now concedes, based upon the testimony elicited at the suppression hearing, that Defendant does, in fact, appear to have standing to object to the search of his sister's apartment.[4] The Court, likewise, agrees with the government's most recent assessment. Even though Defendant's name was not on the apartment lease, the Court finds sufficient evidence to believe that Defendant was more than just a casual visitor. See <u>United States v. Berryhill</u>, 352 F.3d 315, 316 (6th Cir. 2003) (holding that a casual, transient visitor does not have a reasonable expectation of privacy in his host's home). Specifically, the Court finds Defendant's testimony to be credible, to the extent he stated that he had lived with his sister for approximately two months prior to August 17, 2005. The Court further finds, as indicated by both Officer Neal and Defendant,

---

[4] <u>See</u> note 2.

that Defendant's clothes and personal effects were found inside the apartment.

Based on the above facts, the Court finds that Defendant McGraw maintained a legitimate expectation of privacy at the Morningside residence. Accordingly, the Court finds that the search of Ms. McGraw-Smith's apartment implicated Defendant McGraw's Fourth Amendment rights. Thus, the Court must next determine whether the consent to search given by Ms. McGraw-Smith was valid.

b. Authority For The Search

Where valid consent is given, a search is permissible under the Fourth Amendment even without a warrant or probable cause. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Such consent must be "freely and voluntarily given." Id. at 222. Valid consent may be given not only by the defendant but also by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974); United States v. Morgan, 435 F.3d 660, 663 (6th Cir. 2006). When the consenting party is not the defendant but a third party, the consent is valid if "the facts available to the officer at the moment...[would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." Hudson, 405 F.3d at 441 (quoting Illinois v. Rodriguez, 497 U.S. 177, 188 (1990)).

The Court will consider, in turn, whether Ms. McGraw-Smith possessed common authority over the apartment to consent to the search, whether Defendant expressly objected or refused consent to the search, and finally, whether the consent given by Ms. McGraw-Smith was voluntary.

### i. Third-Party Consent

The evidence introduced at the suppression hearing indicates that the officers learned, through their investigation of the shooting at Linden Park, that the suspect [Defendant] was staying with his sister, Lavern McGraw-Smith, who leased apartment 285G at Morningside Apartments. When the officers knocked on Ms. McGraw-Smith's door, she answered the door and permitted the officers to enter her residence. She further informed the officers that her brother [Defendant] lived with her, but stated that no one was there at that time. Investigator Bell asked if they could search the apartment to make sure nobody else was there. McGraw-Smith said, "yes." The officers conducted a search and found Defendant in the bathroom of the apartment and took him into custody. Once Defendant was in custody, Investigator Bell asked Ms. McGraw-Smith if they could search the apartment for weapons. She said, "go ahead." The officers conducted a search and a pistol was found on the top shelf of the bathroom closet where Defendant was found.

As to Ms. McGraw-Smith's authority to consent to the search, the proof was undisputed that her name was on the lease and that she resided at the residence. Thus, McGraw-Smith clearly possessed "common authority over the premises" and, as a result, was authorized to give consent to search the residence for both Defendant and weapons. Further, the bathroom, where both Defendant and the firearm were located, was a "common area" equally accessible and mutually used by Defendant and Ms. McGraw-Smith. A joint occupant assumes the risk that his co-occupant might expose their common private area to a search. United States v. Matlock, 415 U.S. 164, 171 n.7 (1974). Thus, once this risk is assumed, any reasonable expectation of privacy is lost. Id.

Additionally, for the sake of completeness, the Court would also note that the United States Supreme Court has most recently created an exception to the "third-party consent" rule stated in <u>Matlock</u>[5]. In <u>Georgia v. Randolph</u>[6], the Supreme Court held that "a warrantless search of a shared dwelling for evidence *over the express refusal of consent by a physically present resident* cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 126 S.Ct. 1515, 1526 (March 22, 2006) (emphasis added). Underscoring the rigidity of its holding, the <u>Randolph</u> Court further stated that "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the colloquy, loses out." <u>Id.</u> at 1527 (explaining that the <u>Randolph</u> holding is not to undercut <u>Matlock</u>). The latter is true, so long as "there is no evidence that the police have removed the potentially objecting tenant from the residence for the sake of avoiding a possible objection." <u>Id</u>.

In the present case, at the time Ms. McGraw-Smith consented to the second search, i.e., a search of the residence for weapons, (1) Defendant was physically present [standing in the threshold of the apartment door], (2) Defendant testified that he both heard and saw Investigator Bell ask his sister for consent to search the apartment for weapons, (3) Defendant testified that he both

---

[5] The <u>Matlock</u> Court established that "the voluntary consent of any joint occupant of a residence to search the premises jointly occupied is valid against the co-occupant, permitting evidence discovered in the search to be used against him at a criminal trial." <u>Matlock</u>, 415 U.S. at 169.

[6] In <u>Randolph</u>, police went to the home of Scott and Janet Randolph to investigate a domestic dispute. Janet informed the police that Scott was using drugs, and that drugs would be found inside the couple's home. While standing outside the house with both Janet and Scott present, one of the officers asked Scott for permission to search the house, which Scott refused to give. The officer then turned to Janet and asked for her permission to search the house. Janet consented to the search, and inside the house the police found evidence of cocaine residue in a straw. Scott was charged with possession of cocaine, and moved to suppress the cocaine evidence. The trial court denied the motion, and Scott appealed. The Georgia Court of Appeals reversed, and the Georgia Supreme Court affirmed its decision. The Supreme Court agreed with the Georgia Supreme Court.

heard and saw his sister give Bell consent to search the apartment for weapons, <u>but</u> (4) Defendant did <u>not</u> expressly object or refuse consent to the search.  Thus, keeping in line with <u>Randolph</u>, this Court finds that Defendant, though nearby and/or present and with a self-interest in objecting, did not object, and even though he was not invited to participate in the colloquy, he nontheless "loses out."  Further, because Defendant was arguably "present" [at the threshold of the apartment where he could hear/see his sister give consent], the Court finds that there is no evidence that Defendant was removed to avoid a possible objection.  Finally, because Defendant did not expressly object or refuse consent to the search, the facts in <u>Randolph</u> are distinguishable from the facts here and, thus, the officers search of the apartment and seizure of the firearm was permissible if consent was voluntary.

### ii.  Voluntary Consent

The remaining issue is whether the consent given by Ms. McGraw-Smith was voluntary.

An officer may conduct a warrantless search when the person with a privacy interest in the item to be searched gives a free and voluntary consent.  <u>Schneckloth</u>, 412 U.S. at 219-22.  When the validity of a warrantless search is based on consent, however, the government has the "burden of proving, by a preponderance of the evidence, through 'clear and positive testimony,'" that consent was "freely and voluntarily given," and was not the result of coercion, duress, or submission to a claim of authority.  <u>United Stats v. Worley</u>, 193 F.3d 380, 386 (6th Cir. 1999); <u>United States v. Riascos-Suarez</u>, 73 F.3d 616, 625 (6th Cir. 1996).  Whether a defendant's consent was voluntary is a question of fact to be determined from the totality of the circumstances.  <u>United States v.</u>

Mendenhall, 446 U.S. 544, 557 (1980); United States v. Van Shutters, 163 F.3d 331, 335 (6th Cir. 1998). Relevant factors include the defendant's age, intelligence, and education; whether she understands her constitutional rights; the length and nature of the detention; and the use of coercive or punishing conduct by the police. United States v. Valdez, 147 Fed.Appx. 591, 596 (6th Cir. 2005). The Fourth Amendment requires only that the police reasonably believe the search to be consensual. Id. (citing Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990)).

Officer Neal and Defendant both testified that Ms. McGraw-Smith permitted the officers to enter the apartment and (1) gave them verbal consent to search the apartment to make sure nobody else was there, and (2) again gave the officers verbal consent to search the apartment for firearms after the initial search. Thus, all testifying parties agreed that Ms. McGraw-Smith did, in fact, verbally consent to the searches. The only question, then, is whether the consent given by Ms. McGraw-Smith was unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion. The Court would also note that with regard to the first search, Defendant, in his own testimony, conceded and/or admitted that Ms. McGraw-Smith's consent was voluntary.

Defendant first argues that consent was given involuntarily because Ms. McGraw-Smith "could not have known of her right to refuse consent." [Doc. 87-1, p.12]. In support of this position, Defendant arguess that (1) the officers did not specifically advise McGraw-Smith that she had a right to refuse the search or require law enforcement to obtain a search warrant, nor was she asked to sign a written consent form, (2) Ms. McGraw-Smith was in custody and, thus, should have been informed that consent could be refused, and (3) Ms. McGraw-Smith "suffers from a debilitating brain injury that severely limits her cognitive abilities."

A consent search is a standard investigatory technique. Schneckloth, 412 U.S. at 231-

32.  The voluntariness of a consent search is not affected by the consenter's knowledge that he has

a right to refuse consent.  Id. at 234.  Although, whether the suspect was informed of his right to

refuse consent is one of the many factors to consider in determining the voluntariness of the consent,

the police are under no legal obligation to inform a suspect of his right to refuse consent.  "It would

be thoroughly impractical to impose on the normal consent search the detailed requirements of an

effective warning."  Id. at 231.

Officer Neal characterized the two consent exchanges in this way:

Consent 1:
The officers knocked on Ms. McGraw-Smith's door, announced,
"Knoxville Police Department," and asked her if they could come in.
McGraw-Smith opened the door and permitted them to enter the
apartment.  Investigator Bell informed McGraw-Smith that they were
investigating something that happened outside [her apartment] and
explained that they were looking for someone that may have lived
with her.   McGraw-Smith told the officers that her brother
[Defendant] lived with her, but stated that he was not there at that
time.  Bell asked her if they could look around the apartment to make
sure nobody else was in the apartment.  McGraw-Smith said, "yes."

Consent 2:
After the officers found Defendant in the bathroom and placed him
in custody, Officer Neal asked Ms. McGraw-Smith why she had not
informed them that Defendant was in the bathroom.  He told her that
they could put her in jail for that.  McGraw-Smith responded that she
had been asleep and did not know Defendant was in the apartment.


Shortly after her conversation with Officer Neal, Investigator Bell
asked Ms. McGraw-Smith if there were any weapons in the
apartment.  She said, "no."  Bell asked if they could look around.
McGraw-Smith said, "go ahead."

Contrary to Defendant's assertion [Doc. 87-1, p.12, 20], the Court finds that Ms. McGraw-Smith

was not "seized" within the meaning of the Fourth Amendment and/or "in custody" when she gave

consent to search on both occasions. She was not restrained by handcuffs or removed from her property, nor were the officers' firearms drawn. Further, Ms. McGraw-Smith was not the subject of the investigation. After she permitted the officers to enter her residence, the officers told her that they were investigating an incident that had happened outside [her apartment] and explained to her that they were looking for someone who may have lived with her [Defendant].

The record [Doc.58] also reflects that Defendant's arrest "Occurred On and Between" 4:15 p.m. to 4:23 p.m. on August 17, 2005. Based upon the police report and the testimony elicited at the hearing, the Court finds that the officers were not in Ms. McGraw-Smith's apartment for a protracted period of time. Finally, to the extent that Defendant argues that Ms. McGraw-Smith could not have felt that she was free to leave because the officers blocked her means of egress, the Court would note that: (1) Ms. McGraw-Smith was in her own home, (2) she invited the officers to enter her home, (3) the officers were only in her apartment for a short time and, more importantly, (4) there is no evidence before the Court that the officers blocked her means of egress, either intentionally or by accident.

Next, Defendant argues that Ms. McGraw Smith "could not have known of her right to refuse consent" because she "suffers from a debilitating brain injury that severely limits her cognitive abilities." Despite Defendant's contentions regarding Ms. McGraw-Smith's alleged intellectual deficiencies, the evidence presented in this case indicates to the Court that Ms. McGraw-Smith had no problem comprehending the conversations she had with the officers and/or communicating with the officers on August 17, 2005. Officer Neal described Ms. McGraw-Smith as having been cooperative; he stated that he could not detect any type of speech disruption, nor did he have trouble communicating with her. While the record does reflect that Ms. McGraw-Smith

suffered a traumatic head injury and underwent surgery for same in 1997, no evidence was presented to the Court, beyond Defendant's testimony, which would lead the Court to believe that in 2005, Ms. McGraw-Smith was incapable of communicating with others or effectively processing information or making decisions, or that such injury affected her understanding of what she was doing. In fact, based on the record before it, the Court finds that Ms. McGraw-Smith appeared to have no problem comprehending the situation at hand; she was able to respond intelligently to the officers questions; and she appeared to have no problem explaining to the officers why she had not informed them that Defendant was in the bathroom. This does not, in the Court's estimation, portray a picture of someone with "severely limited cognitive abilities." Moreover, the Court does not find that the "typical reasonable person" would have believed Ms. McGraw-Smith was "severely limited," as suggested by Defendant.

Interestingly enough, Defendant conceded at the suppression hearing that Ms. McGraw-Smith's first consent was voluntary, while maintaining that her second consent was not. The Court is unable to ascertain how someone with "severe cognitive limitations" could give voluntary consent with regard to the first search, but then moments later (when consent is requested for the second search), be so "severely limited" that she cannot give voluntary consent again.

It also appears to the Court that Ms. McGraw-Smith's alleged "impairment" did not render her incapable of leasing the apartment she lived in. Further, while Defendant contends that Ms. McGraw-Smith required a "caretaker," the Court notes that Defendant had only resided at her apartment for approximately two months prior to his arrest in 2005, and the record does not reflect whether anyone resided with her prior to Defendant's short-term stay. Based on the fact that Ms. McGraw-Smith's name was the only name on the lease and the apartment was a one-bedroom

apartment where Defendant had only lived with her a short time, the Court is not persuaded by Defendant's testimony that she required the type of constant care-taking which Defendant urged at the hearing.

Further, the record reflects that since Ms. McGraw-Smith's injury in 1997, the only time Defendant has ever lived with, or even been around, Ms. McGraw-Smith was from June, 2005 thru August 17, 2005. Defendant's testimony is the only evidence before the Court regarding Ms. McGraw-Smith's alleged cognitive limitations. Defendant urges the Court to believe that Ms. McGraw-Smith's condition has not improved, or only "slightly improved," since 1997. However, Defendant has no firsthand knowledge of her condition/behavior between May, 1997 thru May, 2005. Notably, Ms. McGraw-Smith did not testify at the hearing, so that leaves the Court with only Officer Neal's testimony and Defendant's testimony. With regard to Defendant's testimony, the Court would note that Defendant did not refute Officer Neal's testimony that he had no trouble communicating with Ms. McGraw-Smith on that day. In fact, the Court finds Defendant's testimony regarding the events of August 17, 2005, to mostly corroborate Officer Neal's testimony, especially concerning the dialogue exchanged between the officers and Ms. McGraw-Smith, as well as the timing of such exchange, and the voluntariness of the first consent.

Thus, for the foregoing reasons, the Court credits the testimony of Officer Neal and finds that because: (1) the apartment was leased to Ms. McGraw-Smith, (2) Ms. McGraw-Smith answered the door when the officers knocked, (3) the officers had no trouble communicating with Ms. McGraw-Smith, and (4) Ms. McGraw-Smith was cooperative and responded intelligently to their questions, the officers could reasonably believe that Ms. McGraw-Smith was capable of validly consenting to the search of the apartment. Although Investigator Bell did not inform Ms. McGraw-

Smith of her right to refuse the searches, no evidence or proof was advanced at the hearing that she was either commanded to and/or required to consent to the searches. To the contrary, Bell asked McGraw-Smith for permission (1) to enter the residence, (2) to search the apartment to make sure nobody else was there, and (3) to search the apartment for weapons. On each occasion, Ms. McGraw-Smith gave verbal consent. "Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion." United States v. Drayton, 536 U.S. 194, 206 (2002).

Next, Defendant argues that consent was given involuntarily because of coercive police questioning and conduct, including both subtle and overt acts of coercion, as well as threats made against Ms. McGraw-Smith [Doc. 87-1, p. 13-18]. The Court does not likewise agree. Based on the record before it, the Court finds that there was: (1) no overt and/or subtle coercive police questioning or conduct, and (2) no evidence of threats and/or force being used against Ms. McGraw-Smith.

Contrary to Defendant's claim that Ms. McGraw-Smith was "surrounded by law enforcement officers" [Doc. 87-1, p. 20], the evidence advanced at the suppression hearing indicates that only three officers were present in the apartment, and two of the officers wore plain clothes. None of the officers brandished their firearms, and although the encounter did not occur in a public place, the record indicates that the parties spoke in conversational tones, and Ms. McGraw-Smith was cooperative. Officer Neal testified that Defendant was also cooperative, in that he did not resist arrest and followed all commands. Neal testified that the only time a weapon was brandished was when the officers found Defendant hiding in the bathroom. The officers reholstered their weapons

as soon as Defendant was handcuffed.

To the extent that Defendant argues Ms. McGraw-Smith's alleged cognitive deficiency made her more vulnerable to police coercion, the Court finds that (1) Ms. McGraw-Smith was not a minor [she was 46 years-old at the time], (2) she was cooperative and communicated appropriately and responded intelligently to the officers' questions, (3) she was informed that she was not the subject of the investigation, (4) she was not seized, (5) no weapon or force was used against her, (6) the officers were not in her apartment for a protracted period of time, and (7) her name was on the lease of the apartment. Thus, the Court does not find that Ms. McGraw-Smith was particularly vulnerable.

To the extent that Defendant argues that "there was confusion within the apartment" and that Ms. McGraw-Smith "witnessed her brother succumb to overt acts and threats of force against him," the Court again disagrees. As to the issue of "confusion," when the officers were first permitted to enter the premises, they informed Ms. McGraw-Smith that they were investigating an incident that happened outside [her apartment] and explained that they were looking for someone who may have lived with her [Defendant]. Ms. McGraw-Smith informed the officers that her brother [Defendant] lived with her, but stated that he was not home. The officers asked if they could look around to make sure no one was there and she said, "yes." Accordingly, the Court finds that Ms. McGraw-Smith was not confused as to why the officer were there. Second, Defendant did not testify that he was threatened by the officers; in fact, all parties specifically testified that Defendant did not resist arrest and was handcuffed in the bedroom without further incident. Moreover, there is no evidence in the record that Ms. McGraw-Smith could even see the encounter between Defendant and the officers, as she was located in the living room of the apartment.

Finally, Defendant argues that Ms. McGraw-Smith was subjected to threats of force and deprivation of liberty [Doc. 87-1, p. 18]. The Court disagrees. After Defendant was found in the bathroom and placed in custody, Officer Neal asked Ms. McGraw-Smith why she had not informed them that Defendant was in the bathroom and told her that he could put her in jail for that. The Court finds that Officer Neal did <u>not</u> tell her that he was *going to put her in jail*, but only that he could. A "defendant must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police in order to invalidate consent." <u>United States v. Elkins</u>, 300 F.3d 638, 648 (6th Cir. 2002) (quoting <u>United States v. Crowder</u>, 62 F.3d 782, 787 (6th Cir. 1995)). Such action was not present here. The fact that Ms. McGraw-Smith *could* go to jail was not a baseless claim, nor was it a threat. Moreover, Officer Neal did <u>not</u> threaten to put Ms. McGraw-Smith in jail if she did not consent to the search. In fact, it was Investigator Bell, not Officer Neal, who later asked Ms. McGraw-Smith for consent to search the apartment for weapons, and according to Defendant's testimony, told her that she was not in any trouble. Again, Ms. McGraw-Smith did not testify at the hearing, therefore, there is nothing in the record to even establish that she had a "subjective belief of coercion," much less that there was any objectively improper action by law enforcement.

Regardless, the Court finds that neither Officer Neal, nor any other officer, subjected Ms. McGraw-Smith to threats of deprivation of liberty. The Court also finds no evidence that the officers attempted to coerce, intimidate, or trick Ms. McGraw-Smith into consenting to the searches. In fact, based on the evidence before it, there is no reason for the Court to believe that Ms. McGraw-Smith's consent and cooperation with regard to the first search was any different from her consent and cooperation with regard to the second search. Thus, the Court finds that Officer Neal's

statement does not vitiate the voluntariness of Ms. McGraw-Smith's consent.

Accordingly, the Court finds, under the totality of the circumstances, that the government has proven, by a preponderance of the evidence, that Ms. McGraw-Smith's consent - to search the residence for Defendant and then, after the officers located Defendant in the bathroom of the apartment, to search the residence for weapons - was, in fact, voluntary and, therefore, was not the product of duress or coercion, either express or implied.

Lastly, the Court finds that Ms. McGraw-Smith's response to Investigator Bell's request to search her apartment, on both occasions, was specific, unequivocal, and intelligently given. When the officers knocked on her door, she invited them in. Investigator Bell explained why they were there and told her they were looking for someone who may have resided with her. In response to Bell's first request to search the apartment, Ms. McGraw-Smith said, "yes." The officers conducted a search and located Defendant in the bathroom. In response to Investigator Bell's second request to search the apartment for weapons, she said, "go ahead[7]." Ms. McGraw-Smith appeared to understand the conversations she had with the officers; she responded intelligently; she was cooperative; and Officer Neal had no trouble communicating with her. In fact, the overwhelming majority of Officer Neal's testimony was corroborated, or at least not contradicted, by Defendant regarding the dialogue exchanged between Ms. McGraw-Smith and the officers. There is no evidence that the officers had their weapons drawn and there is no evidence that the officers threatened Ms. McGraw-Smith in any capacity.

Based on the totality of the circumstances, as discussed above, the Court concludes

---

[7] See United States v. Walls, 116 Fed.Appx. 713, 717 (6th Cir. 2004) (finding Defendant's statement of "go ahead" was not mere acquiescence to a police officer's claim of lawful authority to search, so as to preclude a finding that defendant freely and voluntarily consented to a search).

that a reasonable police officer would have believed that Ms. McGraw-Smith's responses indicated that she clearly and unequivocally consented to the searches. Thus, the Court finds that consent was given "freely and voluntarily," and was not "merely a response conveying an expression of futility in resistence to authority or acquiescing in the officer's request." See United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999). Accordingly, the Court finds that the government has met it burden, by a preponderance of the evidence, and shown, through clear and positive testimony, that valid consent to search was obtained.

## V. CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Defendant Andre McGraw's suppression motions [**Docs. 30 and 57** ] be **DENIED**.[8]

Respectfully submitted,

____s/ C. Clifford Shirley, Jr.____
United States Magistrate Judge

---

[8]
Any objections to this Amended Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).